UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 09 CR 383-5,9 |
| | ) | |
| v. | ) | Chief Judge Ruben Castillo |
| | ) | |
| ALFREDO VASQUEZ HERNANDEZ, | ) | |
| a/k/a "Alfredo Compadre," and | ) | |
| TOMAS AREVALO RENTERIA | ) | |
| | ) | |

**GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS**

i

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................ 1

II.    OVERVIEW OF THE CONSPIRACY .................................. 2

III.   GOVERNING LAW ............................................................ 4

     A.    The Evidentiary Rule is Distinct from the Charged Conspiracy ........... 4
     B.    Existence of and Membership in the Conspiracy .................................... 5
     C.    The "In Furtherance" Requirement ........................................................ 9
     D.    Alternative Bases for Admissibility of Statements ............................. 12

IV.   THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE
     OF THE CONSPIRACY AND DEFENDANTS' PARTICIPATION IN IT ..... 13

     A.    The SINALOA CARTEL ....................................................................... 14
     B.    Structure and Differentiation of Roles ................................................. 16

          1.    Jesus Vicente Zambada-Niebla   ................................................ 17
          2.    Alfredo Guzman-Salazar ............................................................ 18
          3.    Alfredo Vasquez-Hernandez ....................................................... 18
          4.    Juan Guzman-Rocha .................................................................. 19
          5.    German Olivares ......................................................................... 19
          6.    Felipe Cabrera Sarabia ............................................................... 20
          7.    Manuel Fernandez-Navaroo ........................................................ 20
          8.    Tomas Arevalo-Renteria .............................................................. 20
          9.    Pedro Flores and Margarito Flores ........................................... 120

     C.    History of the Investigation .................................................................. 21
     D.    The Evidence Establishing the Existence of the Conspiracy ............... 22

V.    STATEMENT OF FACTS/EVIDENTIARY SUPPORT OF
     THE CHARGED CONSPIRACIES ................................................................. 55

VI.   CONCLUSION ................................................................................................ 59

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits this written proffer, pursuant to Fed. R. Evid. 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987), of the government's evidence supporting the admission of certain co-conspirator statements against defendants at trial.

## I.    INTRODUCTION

This submission begins by providing an overview of the conspiracy in this case.   It then discusses the law governing the admissibility of coconspirator statements under Fed.R.Evid. 801(d)(2)(D), and outlines some of its evidence establishing the conspiracy.    Finally, it summarizes evidence supporting the admission of coconspirators' statements pursuant to Rule 801(d)(2) and for which a pre-trial ruling by the Court is requested, in accord with *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978), and established practice in this Circuit.   *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This proffer does not list all of the government's witnesses and the evidence each will present, nor does it provide all of the evidence that will be presented by those witnesses who are named.   Rather, the proffer is a summary only, offered for the limited purpose of establishing the existence of a conspiracy by a preponderance of the evidence and providing defendants with adequate notice of the nature of the conspiratorial evidence, including the nature of co-conspirator statements made in

1

furtherance of the conspiracy that the government will offer at trial. By presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses, nor is the government committing to introduce each statement contained herein. The government expressly reserves the right to offer additional statements of indicted and unindicted co-conspirators. The government further reserves the right to supplement this proffer in the event that additional evidence of the conspiracy comes to light in advance of trial.

## II.    OVERVIEW OF THE CONSPIRACY

The third superseding indictment charges that from about May 2005 to about December 2008, defendants Alfredo Vasquez Hernandez and Tomas Arevalo-Renteria conspired with other members of the Sinaloa Cartel to possess with intent to distribute and to distribute five kilograms or more of cocaine and one kilogram or more of heroin (Count One); and conspired to import into the United States from Mexico more than five kilograms of cocaine and more than one kilogram of heroin (Count Two). Arevalo-Renteria is further charged with knowingly and intentionally distributing heroin (Counts Three and Six).

The indictment alleges that Vasquez Hernandez was a high-level member of the Sinaloa Cartel, a cocaine and heroin drug trafficking organization in Mexico. R.157 at 2, 6-7. The indictment further alleges that, among other things, Vasquez Hernandez acted as a logistical coordinator for a faction of the Sinaloa Cartel headed by Joaquin Guzman Loera (a/k/a "Chapo Guzman"). *Id.* The indictment alleges that Vasquez Hernandez coordinated the importation to Mexico from Central and

2

South American countries of multi-ton quantities of cocaine, and deliveries of multi-kilogram quantities of cocaine into the United States on behalf of Joaquin Guzman Loera and the Guzman Loera faction of the Sinaloa Cartel, as well as deliveries of bulk quantities of United States currency to Joaquin Guzman Loera and the Guzman-Loera faction from its customers in the United States. *Id.* at 3-4, 6-7.

The indictment alleges that Arevalo-Renteria (i) worked with the Sinaloa Cartel; (ii) acted as a narcotics broker and customer for factions of the Cartel headed by Guzman-Loera and Ismael Zambada-Garcia; and (iii) coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States and deliveries of United States currency back into Mexico to the Sinaloa Cartel. *Id.* at 8.

The scope of the conspiracy thus includes both the Guzman-Loera and Zambada-Garcia factions of the Sinaloa Cartel, and includes the supply of drugs to the Cartel by international suppliers, the coordination of large shipments over and throughout international borders, the transportation and distribution of the drugs, the financial transactions related to the shipments, and the efforts to protect the Cartel's interests in international drug trafficking through violent and other means. The members of the conspiracy, and the declarants of co-conspirator statements, are identified below.

## III.   GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."   Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy [or joint venture] existed; (2) defendant and the declarant were members of the conspiracy [or joint venture]; and (3) the statements were made during the course and in furtherance of the conspiracy [or joint venture]. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A.   The Evidentiary Rule is Distinct from the Charged Conspiracy.

Rule 801(d)(2)(E) is an evidentiary rule that is separate from the substantive law of criminal conspiracy.   The rule applies, and co-conspirator statements are admissible, whenever a statement is made in furtherance of a joint venture, regardless of whether that joint venture has been charged as a criminal conspiracy. As the Seventh Circuit explained in *United States v. Coe*, 718 F.2d 830 (7th Cir. 1983):

> Conspiracy as an evidentiary rule differs from conspiracy as a crime.
> The crime of conspiracy comprehends much more than just a joint

---

[1] No Sixth Amendment confrontation issues are posed at a joint trial by the use of a non-testifying defendant coconspirator's statements which are offered for their truth against another defendant.   This is because "the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause."   *United States v. Bourjaily*, 483 U.S. 171, 182 (1987). Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met. *Id.*   This long-standing rule was not affected by the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).   *See United States v. Hargrove*, 508 F.3d 445 (7th Cir. 2007); *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005).

> venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. . . . Recognizing this, some courts refer to the coconspirator exception as the "joint venture" or "concert of action" exception. . . . A charge of criminal conspiracy is not a prerequisite for the invocation of this evidentiary rule. . . . Indeed, it may be invoked in civil as well as criminal cases. . . .
>
> The proposition that the government did have to establish by a preponderance of independent evidence was that [the individuals] . . . were engaged in a joint venture--that there was a "combination between them . . . ."

*Coe*, 718 F.2d at 835 (citations omitted). Therefore, statements may be admitted under Rule 801(d)(2)(E) notwithstanding the lack of any formal conspiracy charge. *See, e.g., United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *Santiago*, 582 F.2d at 1130.

Moreover, the Seventh Circuit has held that co-conspirator statements need not be made within the period of the charged conspiracy in order for them to be admissible pursuant to Rule 801(d)(2)(E). *Godinez*, 110 F.3d at 454 ("It is irrelevant that the statement was not made within the time frame charged in the indictment."). A declarant's statements may be admitted against the defendants at trial if in furtherance of any "existing conspiracy," and the Rule does not limit admissibility to the dates of the charged conspiracy. *Godinez*, 110 F.3d at 454.

### B.     Existence of and Membership in the Conspiracy

Under *Santiago*, the trial judge must preliminarily determine whether statements by a co-conspirator of the defendant will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were

members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the trial judge determines the statements are admissible, the jury may consider them as it considers all other evidence. *See also United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991); *United States v. Wesson*, 33 F.3d 788, 796 (7th Cir. 1994).

According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements seeking to be admitted) to determine whether the *Santiago* criteria have been met. Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the co-conspirator exception to the hearsay rule (Federal Rule of Evidence 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of the defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178, 180, *United States v. Harris*, 585 F.3d 394, 398-99 (7th

6

Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398-99.

The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000). Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *Coe*, 718 F.2d at 835; *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

Certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries to be made as to the existence of a conspiracy or joint venture and a defendant's membership in it. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63-64 (1997). *See also*

7

*United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every co-conspirator or schemer. *Longstreet,* 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001); *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986).

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004)("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990); *United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## C. The "In Furtherance" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

The Seventh Circuit has found a wide range of statements satisfy the "in furtherance" requirement. *See, e.g., United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part

9

of the information flow between conspirators intended to help each perform his role"
satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526,
545 (7th Cir. 2009)(quotations and citations omitted). *See also United States v.
Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

(1) to conduct or help to conduct the business of the scheme, *United States v.
Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d
529, 533 (7th Cir. 2000);[2]

(2) to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United
States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009);

(3) to identify other members of the conspiracy and their roles, *Alviar,* 573
F.3d at 545;

(4) to plan or to review a coconspirator's exploits,  *United States v. Molt*, 772
F.2d 366, 368-69 (7th Cir. 1985);

(5) as an assurance that a coconspirator can be trusted to perform his role,
*Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*,
493 F.3d 879, 890-91 (7th Cir. 2007);

(6) to inform and update others about the current status of the conspiracy or
a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605
(7th Cir. 2010); *Alviar*, 573 F.3d at 545;

---

[2] Statements that prompt the listener to act in a manner that facilitates the carrying out of
the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128
F.3d 376, 392 (6th Cir. 1997).

(7) to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

(8) to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

(9) to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

(10) to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008); and

(11) "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

Finally, any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *United States v. Rivera,* 136 Fed. Appx. 925, 926 (7th Cir. 2005)(court admitted into evidence a letter written by a coconspirator who was not on trial). "Whether any other coconspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility." *Id.*

It also bears mention that "statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern." *United States v. Potts*, 840 F.2d at 372

11

(citing cases). Moreover, "conversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." *United States v. Shoffner*, 826 F.2d at 628 (quoting and citing cases). A conspirator who has become less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995) (mere inactivity on the part of the conspirator is not sufficient to constitute withdrawal).

### D. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own statements, for example, are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule.[3] *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Moreover, a defendant's own admissions are powerfully relevant to establish the factual predicates for the admission of coconspirator statements against him. *United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997).

The coconspirator statement rule is also not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification; an example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).

---

[3] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). More importantly, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[4] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *See, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

## IV. THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF THE CONSPIRACY AND DEFENDANTS' PARTICIPATION IN IT

At trial, the government's evidence will establish that: (1) all of the defendants were members or associates of the Sinaloa Cartel Mexican Drug Trafficking Organization; (2) the defendants conspired and agreed with each other and with others to possess with the intent to distribute and to distribute in excess of five kilograms or more of cocaine and one kilogram or more of heroin (Count One),

---

[4] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

and (3) conspired to import into the United States from Mexico more than five kilograms of cocaine and more than one kilogram of heroin (Count Two). This section sets forth an overview of the Sinaloa Cartel, a history of this investigation, and a summary of the evidence the government expects to present to establish the existence of the charged conspiracy and defendants' membership in it. The sources of the government's evidence at trial will include: witness testimony (including cooperating co-conspirators), recordings (including recordings involving both defendant Vasquez Hernandez and defendant Arevelo), and seizures of thousands of kilograms of cocaine, dozens of kilograms of heroin, and millions of dollars in United States currency.

### A.  **The Sinaloa Cartel**

Through the testimony of lay and expert witnesses, the government will establish that the Sinaloa Cartel, as it is commonly known to its members, associates, and the public, is a Mexican drug trafficking organization. The Sinaloa Cartel engages in, among other criminal activities, the importation of multi-ton quantities of cocaine from sources of supply in Central and South America into Mexico and the production or importation into Mexico of multi-kilogram quantities of heroin. The cocaine and heroin are then smuggled by the Sinaloa Cartel, generally in shipments of hundreds of kilograms at a time, from Mexico across the United States border, and then distributed throughout the United States, including to Chicago.

14

Members of the Sinaloa Cartel use various methods to import cocaine and heroin into Mexico from Central and South America, including the use of cargo aircraft, private aircraft, submarines and other submersible and semi-submersible vessels, container ships, go-fast boats, fishing vessels, buses, rail cars, tractor trailers, and automobiles. Members of the Sinaloa Cartel coordinate the unloading of multi-ton shipments of cocaine in Mexico, and coordinate the transportation and storage of these shipments within Mexico. Thereafter, members of the Sinaloa Cartel smuggle multi-ton quantities of cocaine, usually in shipments of hundreds of kilograms at a time, and multi-kilogram quantities of heroin, from the interior of Mexico to the United States border, and then into and throughout the United States, including Chicago, for distribution.

Among the distribution cells used by the Sinaloa Cartel was a distribution cell in Chicago operated from Mexico by Pedro Flores and Margarito Flores (the "Flores brothers"). From 2005 through 2008, the Flores brothers were coordinating on behalf of the Sinaloa Cartel and others the distribution in Chicago of approximately 1500 to 2000 kilograms of cocaine per month, as well as multi-kilogram quantities of heroin. The cell controlled by the Flores brothers received regular shipments, every week to ten days on average, of hundreds of kilograms of cocaine. Among those served by the Flores brothers were large-scale cocaine traffickers in Chicago, New York, Washington, D.C., Philadelphia, Cincinnati, Columbus, Detroit, and Los Angeles.

15

Members of the Sinaloa Cartel used various means to evade law enforcement and protect their narcotics distribution activities, including but not limited to: obtaining guns and other weapons; bribing corrupt public officials and law enforcement officers in Mexico; engaging in violence and threats of violence; and intimidating with threats of violence members of law enforcement, rival narcotics traffickers, and members of their own drug trafficking organizations. Members of the Sinaloa Cartel also used coded language and other means to hide their identities, to misrepresent, conceal and hide the drug trafficking activities of the conspiracy, and to avoid detection and apprehension by law enforcement authorities.

**B.**     **Structure & Differentiation of Roles**

Between 2005 and 2008, and for years before those dates and currently, two of the principal leaders of the Sinaloa Cartel were Joaquin Guzman-Loera, a/k/a "El Chapo," a/k/a "Chapo Guzman," and Ismael Zambada-Garcia, a/k/a "El Mayo," a/k/a "Mayo Zambada." Each headed factions of the Sinaloa Cartel and each was ultimately responsible for the overall Cartel's operation. Chapo Guzman and Mayo Zambada, and members of the Guzman-Loera faction and the Zambada-Garcia faction controlled by them, coordinated their narcotics trafficking activities with each other to achieve the goals of the Sinaloa Cartel. Specifically, those goals included obtaining and negotiating the price for multi-ton quantities of cocaine from Central and South American countries, directing and arranging for the transportation of multi-kilogram quantities of cocaine and heroin from the interior of Mexico to the United States border, smuggling this cocaine and heroin into and

throughout the United States, and obtaining cash narcotics proceeds for these activities from customers in the United States and elsewhere.

As part of the Sinaloa Cartel's operations, Chapo Guzman and Mayo Zambada obtained and used the services of numerous co-conspirators to further the Sinaloa Cartel's goals. Among the individuals about whom the government expects the Court will hear testimony, either through the testimony of cooperating defendants, on recorded calls, or both, include the following (in the order they appear in the indictment):

### 1.    Jesus Vicente Zambada-Niebla

Defendant Jesus Vicente Zambada-Niebla, a/k/a "Vicente Zambada-Niebla," a/k/a "Vicente Zambada," a/k/a "Mayito," a/k/a "30," who is Mayo Zambada's son, was a high-level member of the Sinaloa Cartel and the Zambada-Garcia faction, and was responsible for many aspects of the Cartel's operations. ZAMBADA-NIEBLA acted, among other things, as a logistical coordinator who coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States on behalf of defendant Ismael Zambada-Garcia and the Zambada-Garcia faction, and deliveries of bulk quantities of United States currency to defendant Ismael Zambada-Garcia and the Zambada-Garcia faction from its customers in the United States. Zambada-Niebla also, at times, coordinated the delivery of narcotics from South America to Mexico; consulted with rival cartels on behalf of the Sinaloa Cartel; and

participated in high-level meetings with his father, Chapo Guzman, and others to discuss Sinaloa Cartel business.5

### 2. Alfredo Guzman-Salazar

Alfredo Guzman-Salazar, a/k/a "Alfredillo," a son of Joaquin Guzman-Loera, acted as a logistical coordinator who coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States on behalf of defendant Joaquin Guzman-Loera and the Guzman-Loera faction, as well as deliveries of bulk quantities of United States currency to Joaquin Guzman-Loera and the Guzman-Loera faction from its customers in the United States.

### 3. Alfredo Vasquez-Hernandez

Alfredo Vasquez-Hernandez, a/k/a "Alfredo Compadre," acted as a logistical coordinator who coordinated the importation to Mexico from Central and South American countries of multi-ton quantities of cocaine, and deliveries of multi-kilogram quantities of cocaine into the United States on behalf of defendant Joaquin Guzman-Loera and the  Guzman-Loera faction, as well as deliveries of bulk quantities of United States currency to Joaquin Guzman-Loera and the Guzman-Loera faction from its customers in the United States.

### 4. Juan Guzman-Rocha

Juan Guzman-Rocha, a/k/a "Juancho," is a relative of Chapo Guzman and was a high-level member of the Sinaloa Cartel and controlled the "Culiacan Plaza."   In other words, he controlled the flow of narcotics through the Culiacan, Mexico area

---

5 The Court granted defendants Vasquez Hernandez and Arevalo Renteria's motion to sever Zambada-Niebla's case from their own, without objection from the government.

for the Guzman-Loera faction. Juan Guzman-Rocha, a/k/a "Juancho," acted as a narcotics broker and logistical coordinator who coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States on behalf of defendant Joaquin Guzman-Loera and the Guzman-Loera faction, as well as deliveries of bulk quantities of United States currency to Joaquin Guzman-Loera and the Guzman-Loera faction from its customers in the United States.

### 5. German Olivares

German Olivares was a high-level member of the Sinaloa Cartel and controlled the "Juarez Plaza." That is, he controlled the flow of narcotics through the Juarez, Mexico area for the Zambada-Garcia faction. German Olivares acted as a logistical coordinator who coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States on behalf of defendant Ismael Zambada-Garcia and the Zambada-Garcia faction, as well as deliveries of bulk quantities of United States currency to defendant Ismael Zambada-Garcia and the Zambada-Garcia faction from its customers in the United States.

### 6. Felipe Cabrera Sarabia

Felipe Cabrera Sarabia ("Felipe") was a heroin supplier who worked with and for defendant Ismael Zambada-Garcia and the Zambada-Garcia faction, who coordinated deliveries of multi-kilogram quantities of heroin into the United States, as well as deliveries of bulk quantities of United States currency to defendant Ismael Zambada-Garcia and the Zambada-Garcia faction from its customers in the United States.

19

### 7.    Manuel Fernandez-Navarro

Manuel Fernandez-Navarro, indicted in a companion case in this district, was associated with both the Guzman-Loera faction and Zambada-Garcia faction, and acted as a narcotics broker for, and a customer of, the Sinaloa Cartel.    In conjunction with the Sinaloa Cartel, Manuel Fernandez-Navarro received deliveries of multi-kilogram quantities of cocaine and heroin in the United States and elsewhere which were distributed in the United States, and coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States, as well as deliveries of bulk quantities of United States currency to both factions in Mexico from their customers in the United States.

### 8.    Tomas Arevalo-Renteria

Tomas Arevalo-Renteria worked with both the Guzman-Loera faction and the Zambada-Garcia faction, and acted as a narcotics broker and customer for both factions and coordinated deliveries of multi-kilogram quantities of cocaine and heroin into the United States, as well as  deliveries of bulk quantities of United States currency to both factions in Mexico from their customers in the United States.

### 9.    Pedro Flores and Margarito Flores

Pedro Flores and Margarito Flores were narcotics customers of both the Guzman-Loera faction and the Zambada-Garcia faction, as well as the Beltran-Leyva Cartel, who purchased and distributed multi-ton quantities of cocaine, usually in shipments of hundreds of kilograms at a time, in Chicago and

elsewhere. The Flores brothers also purchased and distributed multi-kilogram quantities of heroin from the Sinaloa Cartel for distribution in Chicago, Illinois.

### C.    <u>History of the Investigation</u>

The Sinaloa Cartel, and Chapo Guzman and Mayo Zambada in particular, have been the subject of numerous federal investigations, resulting in Chapo Guzman's indictment in no fewer than six federal districts between 1995 and 2009, and Mayo Zambada's indictment in no fewer than three federal districts. In addition, both Guzman-Loera and Zambada-Garcia, as well as their organizations, have been designated by the President of the United States as Narcotics Kingpins pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1905(d), and 31 C.F.R., Parts 501 and 598. Both Guzman-Loera and Zambada-Garcia are fugitives in this case. The investigation in the Northern District of Illinois began as a DEA investigation into cocaine and heroin trafficking in Chicago. As part of that investigation, the Flores brothers were identified (as they had been in other investigations) as the sources of supply to large-scale narcotics distributors in the Chicago area, including Milwaukee, Wisconsin, where the Flores brothers had been indicted in 2003 on federal narcotics charges.

In the summer of 2008, the Flores brothers approached the U.S. government about the prospect of cooperating with the government. After a period of discussions with counsel, the Flores brothers began providing the government with information about their narcotics trafficking activities and those associated with them, including their relationship with the leadership of the Sinaloa Cartel.

D.   **The Evidence Establishing the Existence of the Conspiracy**

The evidence in this case will be comprised primarily of the testimony of cooperating witnesses, recorded conversations among co-conspirator members of the Sinaloa Cartel, and law enforcement seizures of thousands of kilos of narcotics and millions of dollars of U.S. currency.   At trial, the government currently anticipates calling approximately ten cooperating witnesses who were involved in large-scale narcotics trafficking activities with defendants Vasquez Hernandez and/or Arevalo Renteria.   Each of these witnesses will offer testimony of Vasquez Hernandez and Arevalo Renteria's direct participation in the conspiratorial objectives of the Sinaloa Cartel as charged in the indictment, specifically, the import of multi-ton quantities of cocaine from Central and South American countries, including Colombia and Panama, to the interior of Mexico, and then on to the United States.   R.157 at 9-10. In addition, several of these witnesses will further testify to Arevalo's membership in the Sinaloa Cartel and his involvement in trafficking thousands of kilograms of cocaine and dozens of kilograms of heroin.

The bulk of the witnesses the government intends to call at trial will offer direct evidence of the existence, structure and conspiratorial intent of the Sinaloa Cartel, and defendant Vasquez Hernandez and defendant Arevalo Renteria's participation in the conspiracy during the period alleged in the third superseding indictment, May 2005 through December 2008.   These witnesses will testify regarding their interaction with each defendant in Mexico as each engaged in a number of activities to further the conspiratorial objectives.

22

Several witnesses are expected to testify that Vasquez Hernandez identified himself as a lifelong friend of Chapo Guzman, and that Vasquez Hernandez stated that he oversaw the transportation of cocaine for Chapo Guzman in several different ways. On behalf of Chapo Guzman, Vasquez Hernandez organized the transportation of cocaine from Colombia to Mexico in airplanes; was involved in the transportation of cocaine from Colombia to Mexico in submarines used to evade law enforcement and the military when moving cocaine across the open ocean; and facilitated the transportation of cocaine within Mexico and in the United States in rail cars. Several witnesses are expected to testify to Vasquez Hernandez's use of a train transport system on behalf of the Sinaloa Cartel to deliver large quantities of cocaine to Chicago. Several witnesses will also testify that Vasquez Hernandez also handled the logistics of transporting large shipments of bulk currency from drug proceeds in both the United States and Mexico. These activities, as well as other aspects of Vasquez Hernandez's involvement with the narcotics-trafficking activities of the Sinaloa Cartel, are corroborated in a recorded meeting held in Guadalajara, Mexico in November 2008, which the government intends to introduce at trial, discussed *infra*.

Several of the witnesses at trial will also testify to Arevalo-Renteria's attendance at high-level meetings of the Sinaloa Cartel and his coordination of two heroin shipments from Mexico to Chicago in October and November 2008. Considered individually and collectively, this testimony will establish the existence

of the conspiracy involving the charged members of the Sinaloa Cartel and support the admission of co-conspirator statements summarized below.

The evidence at trial will establish that Joaquin Guzman-Loera, Ismael Zambada-Garcia, Vicente Zambada-Niebla, Alfredo Guzman-Salazar. Alfredo Vasquez Hernandez, Juan Guzman-Rocha, German Olivares, Felipe Cabrera Sarabia, Tomas Arevalo Renteria,  Pedro Flores, Margarito Flores, and others formed a confederation for the purpose of committing, by their joint efforts, a criminal act; namely, conspiring to import into the United States and distribute ton-levels of cocaine and heroin.   The evidence will further establish that there was a "participatory link" between Vasquez Hernandez and Arevalo-Renteria and the conspiracy, that is, Vasquez Hernandez and Arevalo-Renteria each knew of the conspiracy and intended to join and associate himself with its criminal design and purpose.  *See, e.g., United States v. Pulido*, 69 F.3d 192, 206 (7th Cir. 1995).   The government's evidence will further establish that the conspiracy began no later than May 2005 and ended no earlier than December 2008.

The statements summarized below are based principally on the prior testimony of certain coconspirators and recorded calls in the possession of the government.   Because almost all of these statements are quite extensive and detailed, and because the number of coconspirators in this conspiracy is quite large, this *Santiago* proffer is necessarily just a summary of the statements that have been

and will continue to be provided to the defense, particularly following the Court's December 19, 2013, deadline for the production of § 3500 and *Giglio* material.[6]

The government will introduce at trial numerous tape-recorded telephone conversations between and among co-conspirators that reflect methods of operation of the conspiracy, including prices for cocaine, transportation methods, the progress of shipments, the transportation of shipments, and the identification of co-conspirators. Many of these conversations were recorded by the Flores brothers after they began cooperating with the government, and include conversations with both defendants Vasquez Hernandez and Arevalo Renteria, as well as numerous narcotics-related conversations with several other co-conspirators. The Seventh Circuit has repeatedly held that "[a] co-conspirator's arrest does not automatically terminate a conspiracy; the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of their partners." *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir. 1988) (*citing United States v. Papia*, 560 F.2d 827, 835 (7th Cir.1977); *United States v. Thompson*, 476 F.2d 1196, 1200 (7th Cir.)). Citing a similar Sixth Circuit case, the Seventh Circuit explained:

---

[6]The government continues to evaluate potential trial witnesses, and has information that additional witnesses, some of whom have been interviewed by Assistant U.S. Attorneys and agents from other federal districts, may have relevant testimony in the trial of this matter. Thus, this proffer simply identifies the categories of co-conspirator statements the government will seek to introduce, with specific examples of each. The government will make the requisite disclosures to the defense and the Court as its witness list becomes more concrete, but the type of co-conspirator statements are disclosed in this filing. The government reserves its right to supplement this filing as well as its pre-trial disclosures as necessary based on the undersigned's interview of additional witnesses.

> [W]here, as here, the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting "under the direction and surveillance of government agents to obtain evidence against the coconspirators."

*Id.* at 901 (*citing United States v. Hamilton*, 689 F.2d 1262, 1269 (6th Cir.1982)). The Seventh Circuit thus held, "[t]he fact that one party to the conversation was a government informant does not preclude the admission of the conspirator's statements under Rule 801(d)(2)(E)." *Id.*

### 1. Testimony from Pedro and Margarito Flores Regarding the Beginning of the Charged Conspiracy

According to cooperating defendants Pedro Flores and Margarito Flores (the Flores brothers), in approximately May 2005, the Flores brothers were summoned to a series of meetings with several high-ranking members of the Sinaloa Cartel. Prior to these meetings, the Flores brothers had been receiving cocaine and heroin from the Sinaloa Cartel, but from lower-level members and associates of the Cartel. The May 2005 meetings marked the Flores brothers' first interactions with the Cartel leadership and led to direct agreements between the leadership and the Flores brothers under which the Sinaloa Cartel supplied tons of cocaine and dozens of kilos of heroin to the Flores brothers which was ultimately distributed in Chicago and elsewhere in the United States.

The Flores brothers first attended a meeting in Culiacan, Sinaloa in approximately May 2005 with Zambada-Garcia, Guzman-Rocha, Olivares, Zambada-Niebla, defendant Arevalo-Renteria, and several bodyguards and other

members of the Sinaloa Cartel. The Flores brothers and Zambada-Garcia first reached an agreement to re-pay a debt owed by the Flores brothers from their prior dealings with a lower-level Sinaloa Cartel member. The Flores brothers informed Zambada-Garcia that, over the course of the last several years leading up to the May 2005 meeting, the Flores brothers had purchased and sold a total of between approximately 15 and 20 tons of cocaine from the Sinaloa Cartel. Based on this past relationship with lower-level members of the Cartel, the Flores brothers assured Zambada-Garcia that they were willing and able to pay their debt in full.

Additional meetings followed over the next few days, during which the Flores brothers negotiated an agreement by which Zambada-Garcia, Zambada-Niebla, and other members of the Zambada-Garcia faction of the Sinaloa Cartel would provide cocaine and heroin to the Flores brothers. In particular, Zambada-Garcia, Zambada-Niebla, and others agreed to provide cocaine to the Flores brothers on credit at a predetermined price. Zambada-Garcia explained that this was the same price received by other high-level members of the Sinaloa Cartel. By the terms of the agreement, after the Flores brothers sold the cocaine to their own customers, they were to provide payment to Zambada-Garcia and his associates by delivering bulk United States currency to an agreed upon location. On approximately the third day of the meetings, Zambada-Garcia informed the Flores brothers that Guzman-Loera wanted to meet with them. The Flores brothers were then flown from an airstrip near Culiacan to a mountaintop compound to meet with Guzman-Loera. Guzman-Loera informed the Flores brothers that he would honor

the same agreement that the Flores brothers reached with Zambada-Garcia. Guzman-Loera instructed the Flores brothers that one of Guzman-Loera's lieutenants would handle the logistics of delivering cocaine to Chicago and collecting payment after the Flores brothers sold the cocaine.

In addition to these initial meetings, which help establish the existence of the conspiracy, the Flores brothers will also testify to defendant Vasquez Hernandez's and (beyond what is described above) defendant Arevalo Renteria's involvement in the Sinaloa Cartel's business. Among other topics, it is expected that Pedro and Margarito Flores will testify that they met Vasquez Hernandez in approximately 2005 and that Vasquez Hernandez identified himself as a lifelong friend of Chapo Guzman. Pedro Flores and Margarito Flores will testify that over time, Vasquez Hernandez stated that he oversaw the transportation of cocaine for Chapo Guzman in several different ways. On behalf of Chapo Guzman, Vasquez Hernandez organized the transportation of cocaine from Colombia to Mexico in airplanes; was involved in the transportation of cocaine from Colombia to Mexico in submarines used to evade law enforcement and the military when moving cocaine across the open ocean; and facilitated the transportation of cocaine within Mexico and in the United States in rail cars. It is also expected that Pedro and Margarito Flores will testify that Vasquez Hernandez and his wife, Individual M, also handled the logistics of transporting large shipments of bulk currency from drug proceeds in both the United States and Mexico.

28

### 2. The Transportation of Cocaine to the United States

#### a. Flores Brothers Testimony

After the meetings with Guzman-Loera, Zambada-Garcia, Zambada-Niebla, and others, the Flores brothers began to receive regular shipments of cocaine from Guzman-Loera, Zambada-Garcia, and their lieutenants. These shipments contained hundreds of kilos of cocaine each and occurred on average once a week. Consistent with the agreement reached with Sinaloa Cartel leaders Guzman-Loera and Zambada-Garcia, the Flores brothers paid the same price per kilogram of cocaine, regardless of whether the cocaine was received from Guzman-Loera or Zambada-Garcia. While it would vary from transaction to transaction, the Flores brothers agreed with Guzman-Loera, Zambada-Garcia, and others to a system to determine who bore the risk of losing loads of cocaine to law enforcement seizure or theft at any given point of the journey from Mexico until it was distributed inside the United States. Under this system, the Sinaloa Cartel would retain responsibility for the cocaine until it arrived in a certain location, and then the Flores brothers would take over responsibility of the cocaine from that location until it was sold to customers in the United States. In general, the Flores brothers did not become responsible for cocaine until it arrived in Chicago; although, starting in early 2008, the Flores brothers also occasionally took possession of cocaine in Los Angeles and then transported the cocaine to Chicago themselves. The Sinaloa Cartel generally bore the responsibility for having the cocaine or heroin cross the U.S.-Mexico border. The location used to determine who would be responsible for the cocaine was also

used to determine the price of the cocaine. Accordingly, the Flores brothers generally paid Chicago wholesale prices for drugs delivered by the Sinaloa Cartel.

In addition to this testimony, the Flores brothers will testify regarding Vasquez Hernandez's role in the drug trafficking of the Sinaloa Cartel. Among other topics, Pedro and Margarito Flores will testify that Vasquez Hernandez informed them that he had previously utilized train transportation to import cocaine from Mexico into the United States. It is expected that Pedro and Margarito Flores will testify that in late 2006 or early 2007, during the conspiracy period, they entered into an agreement with Vasquez Hernandez to utilize Vasquez Hernandez's train transportation network to transport the Flores brothers' cocaine to Chicago. Pedro and Margarito Flores will testify that as of that time, the Flores brothers were transporting most of their cocaine in semi-trucks and trailers with trap compartments in the roof, but that due to Vasquez Hernandez's prior experience in transporting cocaine by train, Pedro and Margarito Flores decided to branch out into train transportation.

Pedro and Margarito Flores will testify that in accord with their agreement with Vasquez Hernandez, in late 2007 they began to utilize Vasquez Hernandez to transport loads of their cocaine by train to Chicago. Pedro Flores and Margarito Flores will testify that Vasquez Hernandez told them he intended to use a legitimate furniture business as "cover loads" on trains, and transport furniture that also had cocaine secreted within the train cars. In late October or early November 2008, Pedro and Margarito Flores arranged to transport 200 kilograms of cocaine from Los

30

Angeles to Chicago using the train transportation system they had arranged with Vasquez Hernandez. This transaction, as well as other aspects of Vasquez Hernandez's involvement with the narcotics-trafficking activities of the Sinaloa Cartel, are corroborated in a recorded meeting held in Guadalajara, Mexico in November 2008, which the government intends to introduce at trial, and is described in subsection 4(a), *infra*.

Moreover, as detailed in the government's 404(b) motion, Cooperating Witness A ("CW-A") will testify that he/she was formerly associated with members and associates of the Sinaloa Cartel in Mexico, was a source of supply to drug traffickers in the United States, including Chicago, and was also, at times, a coordinator of shipments of cocaine into the United States for a drug trafficking organization in Colombia ("DTO-A") that supplied large volumes of cocaine.

In approximately 2002, according to CW-A, CW-A decided to utilize Vasquez Hernandez's train transportation system to transport, from Guadalajara, Mexico, to Chicago, ton-quantity loads of cocaine. CW-A utilized the Vasquez Hernandez train transport system on approximately four to six occasions in approximately 2002 to transport cocaine from Guadalajara to Chicago. According to CW-A, the cocaine that Vasquez Hernandez transported for CW-A was but a part of larger consolidated loads transporting cocaine for other people, that Vasquez Hernandez arranged to transport from Guadalajara to Chicago. According to CW-A, CW-A's four to six loads that were transported using Vasquez Hernandez's train system totaled approximately 4,000 to 6,000 kilos of cocaine (four to six tons). According to CW-A,

a portion of these loads were delivered to customers in Chicago, and a portion were transported to New York by CW-A's own transport system, once the load was safely delivered in Chicago by Vasquez Hernandez's train system.

CW-A will testify that he/she met personally with Vasquez Hernandez to negotiate the terms of, and payment for, using his train system. Consistent with the testimony of Pedro and Margarito Flores, CW-A will also testify that he was aware that Vasquez Hernandez was also involved in the furniture business in Guadalajara, Mexico.

### b. Seizures of Cocaine

The proffered testimony of the Flores brothers regarding the size, means, and methods of the conspiracy is corroborated by law enforcement's seizure of approximately 398 kilograms of cocaine on or about June 5, 2005, in Bloomington, Illinois. According to the Flores brothers, this load of cocaine was negotiated directly with Zambada-Niebla, on behalf of the Sinaloa Cartel. Prior to this point, Zambada-Niebla had his own workers unload the tractor trailers that brought loads of cocaine up from Mexico and then delivered the drugs to the Flores brothers in smaller portions. In June 2005, Zambada-Niebla informed the Flores brothers that he was comfortable with the Flores brothers' workers unloading the cocaine themselves. Zambada-Niebla then arranged for the approximately 398-kilogram load to be sent to a warehouse the Flores brothers operated in Bloomington. The truck carrying the load was stopped by the Illinois State Police for a routine inspection and the drugs were discovered and seized. According to the Flores

brothers, after the load was seized, Zambada-Niebla instructed the Flores brothers to acquire law enforcement records to prove that the load had in fact been seized. The Flores brothers acquired some form of paperwork and submitted it to Zambada-Niebla. Zambada-Niebla later informed the Flores brothers that they would not be held accountable for the seizure since they were not in possession of the load at the time of the ISP stop.

Upon the Flores brother's cooperation, the government was able to seize, and/or tie to the Cartel's activities, significant quantities of narcotics, including but not limited to the following:

    (a)    On or about June 5, 2005, approximately 398 kilograms of cocaine in Bloomington, Illinois.

    (b)    On or about February 12, 2007, approximately 300 kilograms of cocaine in Naperville, Illinois.

    (c)    On or about July 9, 2007, approximately 400 kilograms of cocaine in Lockport, Illinois.

    (d)    On or about May 26, 2008, approximately 8 kilograms of cocaine in Chicago, Illinois and South Holland, Illinois.

    (e)    On or about August 9, 2008, approximately 250 kilograms of cocaine in Melrose Park, Illinois.

    (f)    On or about October 7, 2008, approximately 15 kilograms of heroin in Chicago, Illinois.

    (g)    On or about November 13, 2008, approximately 20 kilograms of heroin in Northlake, Illinois.

    (h)    On or about November 13, 2008, approximately 8 kilograms of heroin in Chicago, Illinois.

(i)      On or about November 14, 2008, approximately 12 kilograms of heroin in Chicago, Illinois.

(j)      On or about November 14, 2008, approximately 77 kilograms of cocaine in Ontario, California, bound for Chicago, Illinois.

(k)      On or about November 15, 2008, approximately 86 kilograms of cocaine in Ontario, California, bound for Chicago, Illinois.

(l)      On or about November 18, 2008, approximately 89 kilograms of cocaine in Ontario, California, bound for Chicago, Illinois

(m)     On or about November 30, 2008, approximately 322 kilograms of cocaine in Ontario, California, bound for Chicago, Illinois.

### 3.    The Transportation of Narcotics Proceeds from the United States to Mexico

#### a.    Flores Brothers Testimony

The Flores brothers further agreed with Guzman-Loera, Zambada-Garcia, Vasquez Hernandez, Arevalo Renteria, and others to make payment for shipments received through use of a system similar to the transportation system used to move the drugs themselves.   After the drugs were sold to the Flores brothers' customers in the United States, the Flores brothers collected payment in the form of U.S. currency.   The currency was then consolidated, packaged, and transported in bulk to Mexico.   The currency was hidden in trap compartments, generally located within the roofs of tractor trailers and delivered to Sinaloa Cartel couriers in Chicago and Los Angeles.   From their conversations with Guzman-Loera, Zambada-Garcia, Vasquez Hernandez, Arevalo Renteria, and others, the Flores brothers were aware that this money was delivered to safe houses operated by the Sinaloa Cartel and then transported back to the Sinaloa Cartel through its

transportation networks. The Flores brothers are further aware that the cash deposits were safely transported to Mexico because, in most instances, one of the Flores brothers' workers would go to Sinaloa Cartel stash houses in Mexico to verify that the count of the money was correct.

As noted above, it is also expected that Pedro and Margarito Flores will testify that Vasquez Hernandez and his wife, Individual M, also handled the logistics of transporting large shipments of bulk currency from drug proceeds in both the United States and Mexico.

### b.    Money Seizures

The proffered testimony of the Flores brothers regarding the collection and handling of cash narcotics proceeds is corroborated by multiple law enforcement money seizures in amounts consistent with the Flores' brothers description of the volume of drugs and money involved in this conspiracy. Between October 29, 2008, and November 25, 2008, law enforcement seized a total of approximately $15,185,000 in cash narcotics proceeds directly related to the charged conspiracy, as described below:

> (1)    On or about April 14, 2008, law enforcement seized approximately $4,000,000 in United States currency in Palos Hills, Illinois;
>
> (2)    On or about October 29, 2008, law enforcement seized approximately $4,700,000 in United States currency in Hinsdale, Illinois;
>
> (3)    On or about November 4, 2008, law enforcement seized approximately $4,000,000 in United States currency in Hinsdale, Illinois;

(4)     On or about November 17, 2008, law enforcement seized approximately $1,000,000 in United States currency in Romeoville, Illinois;

(5)     On or about November 22, 2008, law enforcement seized approximately $715,000 in United States currency in Chicago, Illinois;[7] and

(6)     On or about November 25, 2008, law enforcement seized approximately $4,770,000 in United States currency in Romeoville, Illinois.

These seizures were the result of searches of money stash houses used by the Flores brothers and direct interactions with couriers for the Flores brothers and the Sinaloa Cartel.   In furtherance of the investigation, a controlled delivery was made from law enforcement agents to couriers of the Sinaloa Cartel of the $4,000,000 recovered from a Flores brothers' stash house in Hinsdale on November 4, 2008.   In conducting the controlled delivery, DEA agents from Chicago transported the $4,000,000 to Los Angeles.   On November 12, 2008, this money was provided to couriers for the Sinaloa Cartel.   Law enforcement maintained surveillance of the money and observed as it was taken to a warehouse and then subsequently loaded into a tractor trailer.   On November 13, 2008, agents followed the tractor trailer as it left the Los Angeles area and drove to the U.S.-Mexico border.   Agents observed the tractor trailer carrying the money across the border to Mexicali, Baja California, Mexico.   The flow of this money is consistent with the Flores brothers' description of

---

[7]As described in further detail below, the $715,000 recovered on November 22, 2008 was related to the payment made by the Flores brothers to Zambada-Garcia, Zambada-Niebla, and Felipe Cabrera Sarabia for a November 2008 15-kilogram of heroin shipment.   In furtherance of the investigation, this money was provided to a courier for the Sinaloa Cartel in a controlled delivery.

how payments were made to the Sinaloa Cartel on a regular basis. The money was first collected from the Flores brothers' narcotics customers as payment for drugs received; the money was then consolidated, counted, and packaged in a Flores brothers' stash house; next the money was transported from Chicago to Los Angeles, where it was provided to couriers of the Sinaloa Cartel; and finally, the money was smuggled across the border into Mexico to be delivered to the Sinaloa Cartel as payment for the Flores brothers' running debt.

### 3. Witness Testimony Concerning Deliveries of Drugs from Central and South America to Mexico

In addition to the testimony of the Flores brothers, the government will introduce evidence at trial of defendant Vasquez Hernandez's involvement, together with other co-conspirators, in the importation of cocaine into Mexico from Central and South America.

Consistent with the proffered testimony of these individuals, during the course of their dealings with Guzman-Loera, Zambada-Garcia, Zambada-Niebla, Vasquez Hernandez, Arevalo Renteria and others, the Flores brothers also became aware of many of the Sinaloa Cartel's means and methods of importing cocaine to Mexico from Colombia. At times, the Flores brothers engaged in direct conversations with Guzman-Loera, Zambada-Garcia, Zambada-Niebla, Guzman-Rocha, Olivares, Alfredo Guzman-Salazar, and Vasquez-Hernandez regarding these means and methods when the Flores brothers invested directly in loads that the Sinaloa Cartel was to receive from its sources of supply in Colombia.

37

The Flores brothers were typically informed of the progress of cocaine shipments from Colombia to Mexico and the methods that the organizations were using to transport those shipments. Guzman-Loera, Zambada-Garcia, and others often agreed to sell the Flores brothers significant quantities of those shipments well before the shipments arrived in Mexico. When the Flores brothers had purchased a percentage of a load, they were kept apprised of the progress of the load by Zambada-Niebla, Guzman-Rocha, Olivares, and others. In particular, the Flores brothers were informed of the timing of maritime shipments and the methods used to deliver them from Colombia, which included go-fast boats, submarines and semi-submersibles, fishing and cargo vessels, and other means. On several occasions, the Flores brothers were invited by Zambada-Niebla, Guzman-Rocha, Olivares, and others to inspect large shipments of cocaine when they arrived in Mexico in order to allow the Flores brothers inspect the quality and select portions of the load that they wished to purchase.

In addition, from their conversations with co-conspirator members of the Sinaloa Cartel, including Vasquez Hernandez, the Flores brothers were aware that Guzman-Loera, Zambada-Garcia, Vasquez Hernandez, and their organization used 747 cargo planes to import ton-quantities of cocaine from Central and South America to Mexico. According to the Flores brothers, Guzman-Loera, Zambada-Garcia, and their associates within the Sinaloa Cartel also used smaller airplanes to transport drugs by air and tractor trailers with trap compartments, buses, trains, and personal automobiles to transport cocaine, first from Central and South America to Mexico,

38

and then from Mexico into the United States. Finally the Flores brothers learned from the conversations with Guzman-Loera, Zambada-Garcia, and others that the Sinaloa Cartel used a network of tunnels to transport narcotics from Mexico into the United States.

4. **Recorded Conversations Proving the Existence of and Defendants' Participation in the Conspiracy**

a. **November 2008 Recorded Conversation with Vasquez-Hernandez**

The proffered testimony of the Flores brothers regarding the means and methods by which the Sinaloa Cartel transported narcotics is corroborated by numerous recorded conversations and other evidence, including a recorded conversation between the Flores brothers, defendant Vasquez-Hernandez, and others which occurred on or about November 3, 2008. As noted above and as charged in the indictment, Vasquez-Hernandez was a logistical coordinator for the Sinaloa Cartel who arranged for cocaine to be received by the cartel in Mexico and delivered to its customers in the United States. During the recorded conversation, Vasquez-Hernandez, Pedro Flores, and Margarito Flores discussed an impending multi-ton submarine load to be delivered from Colombia to the Sinaloa Cartel. The Flores brothers had invested, or prepaid, for a portion of this load.

Vasquez-Hernandez informed the Flores brothers that he believed that the load would arrive soon and remarked that the Flores brothers would potentially hear about the arrival of the load from other co-conspirators before Vasquez-Hernandez learned of it. Vasquez-Hernandez then explained the specifics of a particular

39

method used by the Sinaloa Cartel to smuggle cocaine into Mexico from Central and South America. In particular, Vasquez-Hernandez explained that the Sinaloa Cartel had 747 cargo aircraft that it used for this purpose. The Sinaloa Cartel arranged to have shipments of clothing sent to Central and South America as part of a humanitarian aid project. Once the planes landed in Central or South America, the clothing was offloaded and up to 13 tons of cocaine was loaded onto the plane for the return trip to Mexico. The planes landed at Mexico City International Airport where the cocaine was offloaded from the planes and smuggled out of the airport through various means. Vasquez-Hernandez explained that the three most recent trips utilizing this method, in which Vasquez Hernandez was involved, resulted in the importation of 1700, 7000, and 11- 13,000 kilos of cocaine, respectively, into Mexico.

Moreover, as noted above, Pedro and Margarito Flores will also testify that Vasquez Hernandez informed them that he had previously utilized train transportation to import cocaine from Mexico into the United States. In late October or early November 2008, Pedro and Margarito Flores arranged to transport 200 kilograms of cocaine from Los Angeles to Chicago using the train transportation system they had arranged with Vasquez Hernandez. During the recorded conversation on or about November 3, 2008, Vasquez Hernandez informed Pedro and Margarito Flores that, in addition to the 200 kilos of cocaine Vasquez Hernandez was transporting for Pedro and Margarito Flores, he had placed an additional 76 kilograms of his own cocaine into the same train car. Vasquez Hernandez stated

40

that he was running short on money and asked if the Floreses would be willing to purchase the 76 kilograms. Pedro Flores told Vasquez Hernandez that they would only purchase the cocaine if they could agree to a price that would allow the Floreses to make enough of a profit from the cocaine to make it worth taking on the risk of the extra kilos. Vasquez Hernandez asked on the recording what the wholesale value of cocaine was in Chicago, stating "how much is the kilo going for in Chicago?" Pedro Flores responded that, at that time, the price was between $30,000 and $30,500 per kilo. Ultimately, during the recorded conversation, Pedro and Margarito Flores agreed to purchase the load of 76 kilos of cocaine from Vasquez Hernandez for approximately $2,166,000, which equated to $28,500 per kilo. The government expects that another cooperating witness, Cesar Perez, will testify that he took delivery in Chicago, on behalf of Pedro and Margarito Flores, of the 276 kilograms in early November 2008. Additionally, the government expects to introduce recorded calls with Vasquez Hernandez in early December 2008, in which Vasquez Hernandez discusses that Pedro and Margarito Flores's debt to him is approximately $2.2 million.

### b. May 2008 to November 2008 Recorded Conversations with German Olivares

German Olivares acted as a logistics coordinator and right-hand man to Zambada-Garcia. Olivares negotiated the price and quantity of loads of cocaine distributed by the Sinaloa Cartel and collected payment for drugs that were provided on credit. With oversight from Zambada-Niebla, Olivares often negotiated

loads of cocaine provided to the Flores brothers and was primarily responsible for accounting for the running debt owed by the Flores brothers for narcotics supplied by Zambada-Garcia and Zambada-Niebla. Between May 2008 and November 2008, Pedro Flores consensually recorded three phone conversations with Olivares regarding the Flores brothers' debt and payments made to the Cartel. In one conversation, Olivares informed Flores that there were currently 400 kilograms of cocaine in transit to the Flores brothers and asked that the Flores brothers pay $20,000 per kilogram:[8]

> GO: How much are you going to pay me? How much am I going to make?
>
> PF: I don't know, so you tell me so that. . . .so that. . . .right? So that I can get the people ready now. You let me know.
>
> GO: Could I give them to you at 20 [sell kilos of cocaine at $20,000 per kilo]?

---

[8] This filing contains portions of transcripts from recorded, Spanish language conversations. Such translated quotations are intended as draft materials only and do not reflect a final transcription of the recordings. The preliminary draft language is subject to change prior to trial and is produced herein only to assist the Court in making its findings and to provide adequate notice to defendants of the existence of the statements to allow for the preparation of a defense. As these materials are expressly offered as draft transcripts, they cannot be used as substantive evidence or as impeachment at trial. Portions of these recordings were conducted in coded terms. Statements in [brackets] indicate instances where these coded terms have been interpreted by cooperating witnesses and/or law enforcement agents.

PF:    Hum. . . .Yes, I think. . . .but I just wanted to know so that I can call everyone to let them know and then see what they say.

GO:    That's why I'm saying because I'm going up.  I'm not stupid, if I don't raise it, I won't make anything.

PF:    Oh. . . .how many are they?

GO:    It's 400 that are on their way [400 kilos of cocaine].  I was going to send a fucking two-hundred and two-hundred. . . .but they made a mistake and threw it all in.

PF:    Oh, so it's all going to get here at once?

GO:    Yes.  So that you can get ready. . . .so that you can get a ride to receive 400.

PF:    Yeah, yeah.  I have a. . . .a truck. . . .a pick-up.

In a subsequent recorded phone conversation from November 2008, Pedro Flores and Olivares discussed a payment that the Flores brothers had recently sent to the Sinaloa Cartel.

PF:    Hey, was everything okay with the other check [payment for a past load of cocaine]?

GO:    No, it was short fifteen thousand four hundred and twenty [$15,420].

PF:    Really?

GO:    Yes, for real.  They counted it there; one thousand thirty-five [$1,035,000].  The four hundred twenty are worthless.  Fifteen thousand [$15,000].  Let them know.

PF:    Okay, I'll tell them.  It should be one thousand fifty [$1,050,000].  But I'll ask right now.

GO:    Check with the one that brought it [person who transported the money].

PF:     Yes.   He's the one that brought it down. I don't know because I made a deposit for two thousand one hundred and fifty [$2,150,000], plus the percentage they were going to charge me. Maybe they took something out.

GO:     Check it out well there.

PF:     Okay, I'm going to check that.   And. . . .and. . . .anyway I'm fixing things even if he doesn't comply [Flores will pay the money even if it is the transporters fault].

### 5.      Flores Brothers' Drug Ledgers

In addition to the testimony of witnesses and the introduction of recorded conversations regarding narcotics supplied by the Sinaloa Cartel to the Flores brothers which were distributed in the United States, the government will also offer into evidence drug ledgers maintained by Pedro Flores and Margarito Flores during the operative dates of the conspiracy.   These ledgers are not complete and do not reflect the entirety of the drug trafficking activities which occurred during the conspiracy; however, the ledgers were created by the Flores brothers at or near the time of the events contained therein and provide an accurate accounting of narcotics received and distributed, as well as cash narcotics proceeds collected from the Flores brothers customers and smuggled to Mexico as payments to the Sinaloa Cartel for drugs received on credit.   The coded ledgers reflect the receipt of ton quantities of cocaine from the Sinaloa Cartel and the payment of millions of dollars back to the cartel after the drugs were sold to the Flores brothers' customers.

6.    **Testimony, Recordings and Seizures Related to November 2008 13-Kilogram and 20-Kilogram Heroin Transactions**

In late October 2008, Margarito Flores attended a multi-day meeting with Guzman-Loera, Zambada-Garcia, Zambada-Neibla, Felipe LNU, and other members of the Sinaloa Cartel.   Consistent with past meetings, Margarito Flores was flown in a small plane from an airstrip outside Puerto Rico, Sinaloa, Mexico, to a mountaintop compound.   Margarito Flores first met with Zambada-Garcia and Zambada-Niebla to discuss future narcotics transactions.   Zambada-Garcia and Zambada-Niebla asked Margarito Flores whether the Flores brothers were able to distribute heroin at that time.   Zambada-Garcia, Zambada-Niebla, and Margarito Flores discussed the price per kilo at which the Flores brothers could sell heroin. Zambada-Garcia then asked Margarito Flores to work with Zambada-Garcia's associate Felipe LNU to distribute heroin in the United States.   Zambada-Garcia and Zambada-Niebla then introduced Margarito Flores to Felipe LNU.   Ultimately the Flores brothers agreed to purchase 13 kilograms of heroin from Felipe LNU for a total price of $715,000.

Following the discussion about heroin, Margarito Flores had a further discussion with Zambada-Niebla, Felipe LNU, and others about marijuana. Although the Flores brothers did not have an established customer base for marijuana, Zambada-Niebla and the others stated that they wanted to sell the Flores brothers ten to fifteen tons of marijuana per month.   However, no marijuana transaction occurred following this discussion.

In November 2008, the Flores brothers received the 13 kilograms of the heroin that they agreed to purchase from Zambada-Garcia, Zambada-Neibla, and Felipe LNU. The Flores brothers informed DEA that the heroin had been received, which resulted in a partial seizure of the load, approximately 8 kilograms. Near the same time, the Flores brothers also received a shipment of 20 kilograms of heroin that originated with Guzman-Loera. That load from Guzman-Loera was also seized by law enforcement. Following the seizures, Pedro Flores and Margarito Flores consensually recorded a series of telephone conversations with co-defendants Alfredo Guzman-Salazar, Juan Guzman-Rocha, Felipe LNU, Zambada-Niebla, and Guzman-Loera. During these calls, the Flores brothers claimed that the heroin that they received from Zambada-Garcia, Zambada-Niebla, and Felipe was of inferior quality to the heroin received from Guzman-Loera. In reality, all of the heroin was approximately 94 percent pure; however, the Flores brothers used the ruse of the quality of the heroin as a predicate to have detailed discussions regarding the shipments of heroin with several co-conspirators.

### 7. November 2008 Recorded Conversations with Manuel Fernandez-Navarro

Manuel Fernandez-Navarro, a/k/a "La Puerca," is an unindicted co-conspirator who acted as a narcotics broker who received and distributed multi-ton quantities of cocaine and heroin from multiple cartels, including the Sinaloa Cartel and the Beltran-Leyva Organization. Fernandez-Navarro was indicted in the Northern District of Illinois in a separate, but related case, *United States v. Arturo Beltran-Leyva*, et al, 09 CR 672. Fernandez-Navarro and the Flores brothers often invested in the same loads of cocaine with both the Sinaloa Cartel and the Beltran-Leyva Organization. In so doing, the Flores brothers and Fernandez-Navarro pooled their money and resources together to purchase larger volumes of cocaine. Similar to transactions in which the Flores brothers received their own shipments from the Sinaloa Cartel and Beltran-Leyva Organization, where the Flores brothers and Fernandez-Navarro worked together narcotics were received on credit and then the Flores brothers and Fernandez-Navarro worked together to repay the load. Fernandez-Navarro directly negotiated the receipt of narcotics with several members of the Sinaloa Cartel, including Joaquin Guzman-Loera.

In or about November 2008, Fernandez-Navarro and the Flores brothers agreed to purchase approximately 1.04 tons of cocaine from Arturo Beltran-Leyva and the Beltran-Leyva Organization.[9] On or about November 3, 2008, November

---

[9] Pedro Flores and Margarito Flores provided information to U.S. law enforcement that

47

13, 2008, and November 17, 2008, Pedro Flores and Margarito Flores consensually recorded a series of telephone conversations with Fernandez-Navarro and a member of the Beltran-Leyva Organization to arrange for the cocaine transaction. During these recordings, the Flores brothers and Fernandez-Navarro also discussed transactions they had done with the Sinaloa Cartel, including the extent of their running debt and the price that they paid per kilo of cocaine. In a recorded conversation between Pedro Flores and Fernandez-Navarro, Pedro Flores informed Fernandez-Navarro of Margarito Flores' October 2008 mountaintop meeting with Guzman-Loera, Zambada-Garcia, Zambada-Niebla, German Olivares, and others. Pedro explained that it is difficult to deal with Zambada lieutenant German Olivares. Specifically, Flores stated that Olivares had placed an unrealistic ban on the Flores brothers using $1, $5, and $10 bills to pay their debt to the Sinaloa Cartel. Pedro Flores explained that if the Cartel wanted to receive payment quickly in the United States, the only option was for the Flores brothers to make payment with the money that they received from their own customers, which included small bills. Flores informed Fernandez-Navarro that Zambada-Niebla had instigated the situation by telling Olivares that the Flores brothers had been making fun of Olivares behind his back. Fernandez-Navarro then advised Pedro that he should bypass Olivares and

---

allowed for this shipment of cocaine to be seized in the Los Angeles, California area. Specifically, on or about November 15, 2008, law enforcement seized approximately 600 kilograms of cocaine; on or about November 21 , 2008, law enforcement seized approximately 290 kilograms of cocaine; and on or about November 30, 2008, law enforcement seized approximately 154 kilograms of cocaine, law enforcement also seized approximately $407,547 in the same residence from which the approximately 154 kilograms of cocaine were recovered.

take any problems straight to "the little boy or the father [Zambada-Niebla or Zambada-Garcia]." Flores responded that they cannot because the Flores brothers have been informed that Olivares speaks for Zambada-Garcia and therefore the Flores brothers cannot go over his head.

> **8.  Testimony and Recordings Related to a Plot to Obtain Weapons to Attack a U.S. or Mexican Government or Media Building**

On the last day of the October 2008 mountaintop meetings attended by Margarito Flores, Flores was informed that Guzman-Loera had arrived and wished to meet. A short while later, Flores participated in a meeting that also included Guzman-Loera, Ismael Zambada-Garcia, Zambada-Niebla, and others. During that meeting, Guzman-Loera and Ismael Zambada-Garcia discussed the recent arrest of Zambada-Garcia's brother, Jesus Zambada-Garcia, a/k/a "Rey Zambada," by Mexican authorities.[10] According to Margarito Flores, Ismael Zambada-Garcia stated, in words or in substance, "This government is letting the gringos [American law enforcement] do whatever they want. All we need is for them to try and extradite him."

---

[10] Jesus Zambada-Garcia has been charged in a federal narcotics trafficking case pending in the Eastern District of New York.

49

Guzman-Loera responded, with words to the effect of "it's too early for that, it's going to take a long time. They are fucking us everywhere. What are we going to do?" Ismael Zambada-Garcia responded, "It will be good to send the gringos a message. Whatever we do, we have to do it in someone else's territory, in the smoke [Mexico City, which at the time was primarily under the control of the Beltran-Leyva Organization]." Guzman-Loera responded, in words or in substance, "Yeah, it would be good to do it in the smoke. At least we'll get something good out of it and Arturo [Beltran-Leyva] will get the heat. Let it be a government building, it doesn't matter whose. An embassy or a consulate, a media outlet or television station [attack a Mexican or U.S. government or media building in Mexico City] ."

At that point in the conversation, Zambada-Niebla turned to Flores and said words to the effect of, "Twin, you know guys coming back from the war. Find somebody who can give you big powerful weapons, American shit. We don't want Middle Eastern or Asian guns, we want big U.S. guns, or RPGs [rocket propelled grenades]." Zambada-Niebla made mention of a particular model of weapon, to which Flores responded that he did not think the weapon named was American. Zambada-Niebla responded in words or in substance, "You know what I'm talking about. We don't need one, we need a lot of them, 20, 30, a lot of them." Flores responded, "I'll see what I can do." Guzman-Loera then said to Flores, "Make it your job;" and Zambada-Garcia said, "See what you can do."

As Flores was preparing to leave the mountaintop compound, Zambada-Garcia said in words or substance, "Make sure everything we talked about gets done, the rockets, Felipe, and stop sending those bills to Olivares [stop sending small bills as payment to Zambada-Garcia's lieutenant German Olivares]."

After this mountaintop meeting, Flores called a DEA agent and informed him of this plot to obtain military-grade weapons. Flores asked the agent to provide Flores with black market prices for rocket and grenade launchers so that Flores could appear knowledgeable about the topic if asked again by Guzman-Loera, Zambada-Garcia, Zambada-Niebla, or others. Flores had such a conversation during the same November 29, 2008, recorded phone conversation with Zambada-Niebla described above. After discussing the 13-kilogram heroin transaction, Flores and Zambada-Garcia discussed Zambada-Niebla's request for weapons from American soldiers returning home from war. During the recorded conversation, Zambada-Niebla spoke on behalf of his father, Zambada-Garcia, and told Flores that the Sinaloa Cartel would agree to purchase 20 to 30 weapons from a U.S. soldier who was leaving the service. The conversation was as follows:

MF:   Hey, do you remember what we talked about?  About those toys [rocket/grenade launchers].

VZN:  Yes.

MF:   It's fine.  I have somebody that just got out of the service [U.S. military] and he said he could hook me up [provide weapons], but they're going to charge twice as much.  Is that okay?

VZN:  That's fine, just let me know.

MF:    Okay, they're the kind that you told me about. He said, I can get twenty, thirty for sure [solider can provide 20 to 30 of the type of weapons requested by Zambada-Niebla].

VZN:    All right.

MF:    They're exactly the ones that you told me about he can make them for me. Because he's coming over here to live anyway [soldier moving to Mexico, so willing to sell weapons]. So whatever he gets me will be double [cost will be twice as much].

VZN:    All right.

MF:    Just tell this guy [Zambada-Garcia] as a favor to me, to accept delivery there [Sinaloa Cartel take receipt of the weapons in the U.S.].

VZN:    Yeah, I'll tell him and he'll accept them [Zambada-Garcia will accept delivery of the weapons in the U.S.].

MF:    Okay, it's all set then.

VZN:    All right.

MF:    Okay, we'll talk if anything. Tell everyone I said hi.

VZN:    All right.

MF:    All right.

In a post script to the conversation, Margarito Flores recorded, "That was a call with Vicente Zambada. It's Mayo Zambada's son."

### 9. Testimony, Recordings and Text Messages Related to November 2008 574-Kilogram Cocaine Transaction

In or about November 2008, the Flores brothers agreed to purchase from the Sinaloa Cartel a load of approximately 574 kilograms of cocaine. The Flores brothers' primary contact for this load was Juan Guzman-Rocha. The Flores

52

brothers consensually recorded a series of calls with Guzman-Rocha to arrange for the transaction. Specifically, on behalf of the Sinaloa Cartel, Guzman-Rocha agreed to provide the cocaine to the Flores brothers in the Los Angeles area. Once the cocaine arrived in Los Angeles, Pedro Flores and Margarito Flores provided its location and other information to U.S. law enforcement. Based on the information provided by Pedro Flores and Margarito Flores, law enforcement seized 77 kilograms of cocaine on November 14, 2008; 86 kilograms of cocaine on November 15, 2008; 89 kilograms of cocaine on November 18, 2008; and 322 kilograms of cocaine on November 30, 2008. The recordings between the Flores brothers and Guzman-Rocha accurately reflect the quantities of these individual seizures.

In addition to the consensually recorded conversations, the Flores brothers also maintained a series of text messages exchanged with Guzman-Rocha pertinent to the November 2008 cocaine deliveries. Consistent with their agreement with the leadership of the Sinaloa Cartel, the Flores Brothers received this load of cocaine on credit. Following the November 2008 cocaine deliveries, the Flores brothers were ordered by Guzman-Rocha to pay $5,850,000 to be applied to the running debt they owed to the Sinaloa Cartel. On or about November 29, 2008, Pedro Flores and Guzman-Rocha exchanged text messages discussing the debt owed. Although no money was actually sent, Pedro Flores wrote in a text message that $5,850,000 was in transit to Guzman-Rocha and the Sinaloa Cartel in 212 individual packages containing various denominations of U.S. currency. Guzman-Rocha responded with

an order that the Flores brothers should stop sending $1 and $5 bills to the Sinaloa Cartel, as such small-denomination currency was difficult to exchange in Mexico.

### 10. Testimony, Recordings and Seizures Related to October and November Heroin Transactions with Arevalo-Renteria

In October and November 2008, the Flores brothers agreed to purchase two separate shipments of heroin from the Sinaloa Cartel. The Flores brothers' primary contact for these two shipments was defendant Arevalo-Renteria. In each transaction, the Flores brothers provided information to U.S. law enforcement that allowed the shipments of heroin to be seized. Specifically, based on information from the Flores brothers, law enforcement seized approximately 15 kilograms of heroin in Chicago on October 7, 2008, and approximately 12 kilograms of heroin in Chicago on November 14, 2008.

Pedro Flores also consensually recorded a series of conversations with Arevalo-Renteria regarding these transactions. On or about October 21 and October 22, 2008, Flores recorded two conversations with Arevalo-Renteria regarding payment for the 15-kilos of heroin received. Flores informed Arevalo-Renteria that the Flores brothers had sent more money than they actually owed and asked Arevalo-Renteria to save the extra money for them. On or about November 14, 2008, prior to the second transaction, Flores recorded a conversation during which Arevalo-Renteria passed the phone number and nickname of the courier who would deliver the 12 kilograms of heroin on November 14. Flores provided this name and number to law enforcement. A DEA task force officer acting in an undercover

capacity then recorded several conversations with the courier using the number provided by Arevalo-Renteria. These conversations resulted in the courier delivering approximately 12 kilograms of heroin to the undercover officer on or about November 14, 2008.

## V. STATEMENTS IN FURTHERANCE OF THE CONSPIRACY

As outlined above, the government has strong evidence that defendants Vasquez Hernandez and Arevalo-Renteria participated in a conspiracy to possess with intent to distribute, to distribute, and to import controlled substances. The above proffer of evidence also identifies the declarants (by name or by role) who participated in the conspiracy with the defendants.

The government seeks admission of conversations referenced above, in part, under Fed. R. Evid. 801(d)(2)(E), as statements of coconspirators made during and in furtherance of a conspiracy. The statements made by other individuals who are not coconspirators are admissible to provide context for the statements made by the conspirators. Moreover, the law is clear that a tape-recorded excerpt may be played in its entirety, including the statements of non-conspirators, because their statements are not offered for their truth but merely to place the coconspirator statements in context and make them intelligible for the jury. *United States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

The statements that the government proposes to offer as coconspirator statements are too voluminous to be listed in their entirety in this proffer, but the

nature of the statements are described by category below. These illustrative categories, however, are not intended to be all encompassing, but rather they explain the premise for the admission of representative statements that fall into such categories. All of the statements that the government will offer were made during and in furtherance of the defendants' conspiracies.

A.    <u>**Statements Made To Execute The Conspiracies and Statements Regarding the Conspiracy's Activities**</u>

The first category consists of oral statements made for the purpose of executing the charged conspiracies, and informing others about the joint criminal activity. In general, these statements will include information from cooperating witnesses dating back to the 1990's, as well as recorded and unrecorded conversations, which reveal the day-to-day operations of the Sinaloa Cartel and its joint criminal activity. Conversations regarding the planning and execution of the charged drug trafficking among the conspirators are clearly designed to further that joint criminal activity. For example, the defendants and their coconspirators made statements to effectuate and maintain the operation of the Sinaloa Cartel, including its organization, structure, roles and objectives.

**B.** **Statements Designed to Inform or Reassure the Listener and Statements Relating to the Progress and Accomplishments of the Conspiracy**

As noted above, the Seventh Circuit has routinely held that statements designed to inform and reassure the listener about the participants in the conspiracy and the progress of the conspiracy, are statements made in furtherance of the conspiracy and thus admissible under Fed. R. Evid. 801(d)(2)(E). Given the nature of this joint criminal activity charged in this case in terms of time and number of participants, the need to inform fellow conspirators of past, present, and future accomplishments of the conspirators plays a crucial role in the operation of the ongoing criminal activity. Among other things, the government will introduce the conversations discussing the conspirators' past, present, and future relationships with one another, which demonstrate the nature of the relationship among the conspirators. These conversations will include matters relating to the charged drug trafficking – from conversations about the supply of narcotics from South and Central America to Mexico; to conversations about the storage, safekeeping, and transport of narcotics in Mexico; to conversations about the import of narcotics to the United States and the export of United States Currency from the United States.

**C.** **Statements to Recruit and Encourage Coconspirators**

The defendants and their coconspirators recruited and encouraged each other and others to participate in their criminal endeavors. Such statements were designed to enlist and retain people to participate in the conspirators' criminal endeavors, and thus they were in furtherance of the defendants' conspiracies. Thus,

57

for example, conversations will include matters relating to the negotiation of the purchase and sale of narcotics with others in South America, Central America, and the United States.

**D.** **Statements to Conceal the Criminal Objectives of the Conspiracies**

During the charged conspiracies, the defendants and their coconspirators also discussed various methods and actions designed to conceal and protect their criminal activities from others, including informants, rival cartels, and law enforcement. Such statements were in furtherance of the joint criminal conduct because they are designed to afford the conspirators an opportunity to continue in the activities and escape the negative consequences naturally flowing from it.

## CONCLUSION

WHEREFORE, based on the foregoing summary of the anticipated evidence to be offered by the government at trial, the government respectfully requests that the Court issue a preliminary ruling that co-conspirator statements may be introduced at the trial of this matter.

Dated: December 19, 2013

                              Respectfully submitted,

                              ZACHARY T. FARDON
                              United States Attorney


               By:    *s/Thomas D. Shakeshaft*
                      THOMAS D. SHAKESHAFT
                      ANDREW C. PORTER
                      MICHAEL FERRARA
                      MARC KRICKBAUM
                      Assistant United States Attorneys
                      219 S. Dearborn Street, 5th Floor
                      Chicago, IL 60604
                      312-353-5300

59

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the

following document:

### GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

was served pursuant to the district court's ECF system as to ECF filers on

DECEMBER 19, 2013.


By:   *s/Thomas D. Shakeshaft*
     THOMAS D. SHAKESHAFT
     ANDREW C. PORTER
     MICHAEL FERRARA
     MARC KRICKBAUM
     Assistant United States Attorneys
     219 S. Dearborn Street, 5th Floor
     Chicago, IL 60604
     312-353-5300